IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JAQUESE SIMON, o/b/o K.A.W., minor son )
)
v. ) No. 3:13-1245
) Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION )

To:    The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to

obtain judicial review of the final decision of the Social Security Administration ("SSA" or

"the Administration"), through its Commissioner, denying plaintiff's application for

childhood supplemental security income, as provided under Title XVI of the Social Security

Act.  The case is currently pending on plaintiff's motion for judgment on the administrative

record (Docket Entry No. 18), to which defendant has responded (Docket Entry No. 21).

Plaintiff has further filed a reply in support of her motion.  (Docket Entry No. 22)  Upon

consideration of these papers and the transcript of the administrative record (Docket Entry

No. 13),[1] and for the reasons given below, the undersigned recommends that plaintiff's

motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.

## I.  Introduction

Plaintiff Jaquese Simon, on behalf of her minor child (referred to herein as

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

"K.A.W." or "the child"), filed an application for childhood supplemental security income benefits on March 15, 2010, alleging a disability onset date of October 30, 2009, the date of K.A.W.'s birth. The application was denied at the initial and reconsideration stages of state agency review, whereupon plaintiff requested *de novo* hearing of her claim by an Administrative Law Judge (ALJ). The hearing before the ALJ was held on April 6, 2012, when plaintiff appeared with counsel and gave testimony. (Tr. 31-59) At the conclusion of the hearing, the ALJ took the matter under advisement until May 31, 2012, when she issued a written decision finding the child not disabled. (Tr. 11-24) That decision contains the following enumerated findings:

1.      The claimant was born on October 30, 2009. Therefore, he was a newborn/young infant on March 15, 2010, the date [the] application was filed, and is currently an older infant (20 CFR 416.926a(g)(2)).

2.      The claimant has not engaged in substantial gainful activity since March 15, 2010, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: congenital heart disease, asthma and expressive language disorder (20 CFR 416.924(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.      The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6.      The claimant has not been disabled, as defined in the Social Security Act, since March 15, 2010, the date the application was filed (20 CFR 416.924(a)).

(Tr. 14-15, 24)

On September 9, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-3), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

The following record review is taken from plaintiff's brief, Docket Entry No. 19 at 2-4:

K.A.W. is a 4.5 year old boy who lives with his mother, Jaquese Simon. K.A.W. was born with Transposition of the Great Vessels (TGV). Normally a child born with this condition will not survive without a corrective operation. *See* Carol A. Warnes, *Congenital Heart Disease for the Adult Cardiologist: Transposition of the Great Arteries*, CIRCULATION, Vol. 114, Issue 24, American Heart Association Journals, (December 12, 2006), available at http://circ.ahajournals.org/content/114/24/2699.long#ref-49. However, K.A.W falls into the less than one percent of those born with congenital heart defects that have congenitally corrected TGV (C-TGV). *See id.* Normally an individual born with TGV requires an operation to correct the ventricles because they do not allow circulation, however in those individuals who, like K.A.W., have C-TGV the circulation continues because it already flows through the wrong ventricles. *Id.* Therefore, the term "corrected" is a misnomer because nothing is corrected; additional defects functionally mimic some of the corrections that would otherwise require surgery. *Id.* (citing Carol Warnes, *Congenitally corrected transposition: the uncorrected misnomer*, 27 J AM COLL CARDIOL., 1244–1245

(1996). Although this congenital "correction" has allowed K.A.W. to avoid many of the initial serious complications of TGV, he remains at a heightened risk of cardiac failure and death for the rest of his life. First, like most of those with C-TGV, K.A.W. also has ventricular septal defects ("VSD") and "patients with a large VSD usually present in infancy or childhood with congestive heart failure." *Id*.; A.R. at 360. Second, his likelihood of systemic ventricular dysfunction and clinical congestive heart failure is likely to increase with age. *Id.* (citing Graham TP Jr *et al.*, *Long-term outcome in congenitally corrected transposition of the great arteries: a multi-institutional study*, 36 J. AM. COLL. CARDIOL. 255–261 *(*2000). More than one third of patients with C-TGV experience congestive heart failure by the fifth decade while two thirds those with significant associated defects and prior open heart surgery have congestive heart failure by the age of 45. *See* Prieto LR *et al.*, *Progressive tricuspid valve disease in patients with congenitally corrected transposition of the great arteries*, 98 CIRCULATION, 997–1005 (1998).

An echocardiogram was performed on K.A.W. when he was almost two months of age.  A.R. at 355-56.

This demonstrated his underlying condition of dextrocardia with L-TGA. There was a left ventricular outflow tract obstruction noted (ulmonic ventricle) with both a subvalvar as well as valvar pulmonary stenosis present. The total conbined gradient was 880 mmHg across this area with a mean gradient of 60 mmHg. The pulmonary valve appears to be bicuspid measuring 7 mm. There is an LSCV that drains into the coronary sinus. There was no VSD seen on this study even though it was suspected on previous studies. There was no ASD or PDA present. The position of the heart is dextrocardic with the heart being in the right chest with a rightward apex. The morphological right ventricle is on the left side. The morphological left venrtricle is on the right. The aorta is anterior and to the left. In terms of connections through the heart, the systemic veins drain into the right atrium, the right atrium to the LV, the LV to the pulmonary artery. The Pulmonary veins drain to the left atrium and the left atrium drains to the RV. The RV drains to the aorta. *Id.* at 355.

The cardiologist recommended:

At some point Kierre may be a candidate for a double switch type operation. This may involve either a Rastelli and Mustard procedure, at which time we may have to enlarge or create a VSD, otherwise an aortic translocation type procedure with a homograft being placed. Surgical options will be discussed in the future as we can further define this anatomy as the time approaches. *Id.* at 356.

Additionally, K.A.W. has severe lung and respiratory problems. He has been diagnosed with chronic asthma, a history of methicillin susceptible pneumonia, chronic cough, and frequently experiences upper respiratory infections often requiring trips to the Emergency Room. *Id.* at 258-59, 270-75, 279-82, 461-63, 464-68. On October 15, 2011, the treating physician commented, "child looks semi lethargic and is using accessory musckles [sic] and having intercostal retracting to help him breathe." *Id.* at 287. After a CT of the chest on June 18, 2012, the treating physician reported the impression:

Bilateral peribronchovascular alveolar consolidation with areas of septal thickening most prominent in the right upper, superior segment right lower lobe, as well as the lingula. These findings may be compatible with the diagnosis of bronchopneumonia (as history states MSSA pneumonia). Underlying chronic changes are not excluded. *Id.* at 550.

K.A.W. has also been diagnosed with severe oropharyngeal stage dysphagia, which causes him to frequently aspirate liquids. A.R. at 510. A Videofluoroscopic Swallow Study was conducted on August 11, 2011, and it showed poor oral control, passive leak over the base of the tongue, premature spillage, and overfilling of the oral cavity. *Id. at 510-11* As a result, it was recommended that a thickener be added to all liquids consumed by K.A.W. to prevent aspiration. *Id.*

K.A.W. also has significant trouble communicating and has been diagnosed with Expressive Language Disorder (ELD). A.R. at 423-25. The International Statistical

Classification of Diseases and Related Health Problems 10th Version (ICD-10)—the

comprehensive medical classification list maintained by the World Health Organization and

others—describes ELD as "[a] developmental disorder in which the child's ability to use

expressive spoken language is markedly below the appropriate level for its mental age, but in

which language comprehension is within normal limits." (ICD-10, F80.1). After being

evaluated under the Battelle Developmental Inventory-2nd Edition test by Tennessee's Early

Intervention System, the development specialist concluded that K.A.W. presented a 25%

delay in personal-social domain and a 40% delay in adaptive, communication, and cognitive

domains. A.R. at 531. K.A.W. attended speech-language therapy for treatment of ELD, but

his therapy has been especially difficult due to behavioral problems. A.R. at 423, 424.


Additional record evidence is discussed as pertinent in the discussion below.


### III.  Conclusions of Law

#### A.  Standard of Review

This court reviews the final decision of the SSA to determine whether that

agency's findings of fact are supported by substantial evidence in the record and whether the

correct legal standards were applied.  Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d

124, 125 (6th Cir. 2003).  "Substantial evidence is defined as 'more than a scintilla of evidence

but less than a preponderance; it is such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'"  Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th

Cir. 2007) (quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir.

1994)).  Even if the record contains substantial evidence that could have supported an

opposite conclusion, the SSA's decision must stand if substantial evidence supports the

conclusion reached. E.g., Longworth v. Comm'r of Soc. Sec., 402 F.3d 591, 595 (6th Cir.

2005). Accordingly, while this court considers the record as a whole in determining whether

the SSA's decision is substantially supported, it may not review the case *de novo*, resolve

conflicts in the evidence, or decide questions of credibility. See Bass v. McMahon, 499 F.3d

506, 509 (6th Cir. 2007); Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

### B. Standards Governing Disability Determination

To be eligible for childhood disability benefits during the period applicable to

this case, plaintiff must meet the definition of disability set forth at 42 U.S.C. §

1382c(a)(3)(C)(i):

> An individual under the age of 18 shall be considered disabled
> for the purposes of this subchapter if that individual has a
> medically determinable physical or mental impairment, which
> results in marked and severe functional limitations, and which
> can be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than 12
> months.

The Commissioner's regulations implementing this statutory standard are set

forth at 20 C.F.R. § 416.924 et seq. The regulations require, at the first step, that the child

not have engaged in substantial gainful activity during the relevant period. 20 C.F.R. §

416.924(a), (b); see also 42 U.S.C. § 1383c(a)(3)(C)(ii). At the second step, the child will be

deemed not disabled if the child does not have a "severe" impairment, i.e., an impairment

which causes more than minimal functional limitations. 20 C.F.R. § 416.924(a), (c). If the

child has such an impairment, he will be conclusively presumed disabled if he meets the 12-

month duration requirement and his impairments are included in, or medically or functionally equivalent in severity to impairments included in, the Listing of Impairments, 20 C.F.R. § 404, Subpart P, App. 1. 20 C.F.R. § 416.924(a), (d). Accordingly, if the child's impairment(s) does not meet or medically equal a listed impairment, an assessment of whether the impairment(s) is functionally equivalent to a listed impairment is in order. 20 C.F.R. § 416.926a(a). The standards by which the SSA evaluates a child's level of functioning at each step of the process are set out in the regulations at 20 C.F.R. § 416.924a(b). Consideration is given to the child's functional ability in each of the following six broad domains:

1. Acquiring and using information;
2. Attending and completing tasks;
3. Interacting and relating with others;
4. Moving about and manipulating objects;
5. Caring for yourself; and,
6. Health and physical well-being.

20 C.F.R. § 416.926a(b)(1).

Functional equivalence to a listed impairment is established when the evidence shows extreme limitations in one domain of functioning or marked limitations in two domains of functioning. 20 C.F.R. § 416.926a(a). "Marked" is "more than moderate," but "less than extreme"; a marked limitation will be found where the child's impairment "interferes seriously" with his ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). "Extreme" limitations result when the child's

impairment "interferes very seriously" with his ability to independently initiate, sustain, or complete activities; it is the rating which SSA gives to the worst limitations. 20 C.F.R. § 416.926a(e)(3).

## C. Plaintiff's Statement of Errors

Plaintiff's arguments before this Court are directed to the ALJ's weighing of the evidence and application of legal standards on the way to determining that the child's combination of impairments does not functionally equal the severity of any listed impairment. Plaintiff does not contend that the child's impairments meet or *medically* equal the criteria of any listing.

Plaintiff first argues that the ALJ erred by failing to give sufficient weight to the testimony of Ms. Simon. After recounting that testimony in considerable detail, the ALJ weighed its credibility as follows:

> The undersigned finds that the allegations and testimony by the claimant's mother is partially credible, but not to the extent of the claimant being disabled. Given the allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctors. A review of the records in this case reveals no restrictions recommended by the treating physicians.

(Tr. 16) This rationale, albeit brief, is sufficient to support the ALJ's credibility finding. While the regulations recognize that a parent is bound to be intimately familiar with her child's limitations, and one of the only sources of information as to the child's day-to-day condition, see 20 C.F.R. § 416.924a(a)(2), the parent's testimony is still to be weighed against

the medical evidence of record. 20 C.F.R. § 416.924a(a). Plaintiff relies on the policy interpretation of Social Security Ruling (SSR) 06-03p, arguing that the ruling indicates that adjudicators should explain the weight that they give, or do not give, to the parent's testimony, and that the explanation given in this case was insufficient. However, SSR 06-03p requires only the consideration of a parent or caregiver's testimony in light of, e.g., that person's relationship with the claimant and the consistency of his or her testimony with the other evidence in the record; no further explanation of the weighing of such testimony is required or suggested by the ruling. 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006). Rather, SSR 06-03p only speaks to the need to give explicit attention to "other source" evidence in the context of opinion evidence from "'non-medical sources' who have seen the claimant in their professional capacity." Id. Ms. Simon's testimony is neither opinion evidence nor is it based on any professional relationship with her child. Accordingly, the consideration of her testimony in light of her relationship with the child and the other evidence of record is all that is required. 20 C.F.R. § 416.913(d)(4).

It is for the ALJ to resolve any conflicts in the evidence, <u>Felisky v. Bowen</u>, 35 F.3d 1027, 1035 (6th Cir. 1994), and her findings of witness credibility are deserving of great weight and deference. <u>Jones v. Comm'r of Soc. Sec.</u>, 336 F.3d 469, 476 (6th Cir. 2003). The medical records in this case reveal the child's need for treatment related to his expressive language disorder, asthma, and dysphagia, but they do not reveal any evidence or expectation that even with such treatment, the child's conditions have resulted or will result in "marked and severe functional limitations," so as to be totally disabling. 42 U.S.C. § 1382c(a)(3)(C)(i). The ALJ properly weighed the testimonial evidence against the medical evidence of record, and only discounted Ms. Simon's testimony to the extent that it endorsed

limitations that were totally disabling.  This determination is supported by substantial evidence.

Plaintiff further contends that the ALJ erred in giving "some weight" to the opinions of the nonexamining consultants (Tr. 16), when those opinions reflected a lack of adequate familiarity with the child's medical history.  However, the ALJ made only brief note of the opinions in question, and expressly rejected them as they bore on the child's ability to acquire and use information and to interact and relate with others.  Id.  The determination that these consultants' opinions were due "some weight" as opposed to no weight, if error, is harmless.

Finally, plaintiff argues that the ALJ erred in her consideration of the child's functional abilities when she found "less than marked" limitation in the domains of acquiring and using information; interacting and relating with others; caring for yourself; and, health and physical well-being.

Regarding acquiring and using information, plaintiff argues that the ALJ should have found the existence of marked limitations based on the child's scores on the Battelle Developmental Inventory, Second Edition (BDI-II), an instrument used in this case to evaluate initial eligibility for Tennessee Early Intervention Services.  (Tr. 530)  Plaintiff argues that the BDI-II is "a comprehensive standardized test designed to measure ability or functioning" in the domain of acquiring and using information, and so the child's scores in the cognitive and communication domains of the BDI-II, which were more than two standard deviations below the mean, should compel a finding of marked limitation pursuant to 20 C.F.R. § 416.926a(e)(2)(iii).  That section of the regulation provides that "[i]f you are a child of any age . . ., we will find that you have a 'marked' limitation when you have a valid

score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability of functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score." Assuming *arguendo* that the BDI-II is such a test designed to measure the functional ability to acquire and use information, the regulation further requires that in order to warrant a finding of marked limitations, the valid, qualifying BDI-II test score must be accompanied by day-to-day functioning that is consistent with that score. The ALJ cited examples of the child's functional abilities with respect to acquiring and using information at the ages of six, nine, twelve, and fifteen months, in support of the notion that the child was hitting typical developmental milestones. (Tr. 18) Only upon considering the results of the BDI-II administered at 23 months, which showed a 40% delay in the adaptive, cognitive, and communication domains, was the ALJ persuaded that the child was properly categorized as limited with respect to acquiring and using information, albeit less than markedly. Id. This determination is consistent with the results of other testing performed on the child at the age of 23 months, when he was first diagnosed with expressive language disorder by speech pathologist Jennifer Vick. (Tr. 423-25) This testing revealed normal results including a standard score of 96 in the domain of "expressive communication" and a "total language" score of 95, but with the following caveat:

> It should be noted that although the standard scores on the Expressive Communication portion of this standardized test fall within the normal range (85-115), [K.A.W.] was observed and reported to have a limited expressive lexicon and is not combining any words at the time of this initial evaluation. He also continues to jargon frequently. His expressive skills are more like that of an 18 to 20 month old child and his mother feels that he is significantly frustrated by communication.

(Tr. 423)  The ALJ cited these test results in her decision, noting that functional abilities equivalent to a 19-month-old child would not satisfy the regulatory definition of marked limitation in the case of the 23-month-old child here.[2]  (Tr. 15)  The ALJ further equated these test results with the BDI-II results, finding that they both supported the existence of functional limitation that was less than marked.  Id.  This determination is in keeping with the regulations, which state that the SSA will not rely on any one test result alone to establish the existence of a marked or extreme limitation in a domain, but will consider all test scores together with the other sources of evidence about the claimant's functional abilities and limitations, resolving any material inconsistencies between such test results and other evidence on the record as it stands, unless additional evidence is necessary to inform the resolution.  20 C.F.R. § 416.926a(e)(4).  The undersigned finds the ALJ's determination as to this functional domain to be substantially supported by the evidence of record.

Regarding the domain of interacting and relating with others, plaintiff contends that the ALJ improperly found a less than marked limitation, citing the child's delay in expressive language development on testing at 23 months of age (Tr. 423-24) and his excessive tantrums during speech therapy sessions and in the home.  The ALJ cited both the

---

[2]The standard employed by the ALJ is found at 20 C.F.R. § 416.926a(e)(2)(ii), which provides that "[i]f you have not attained age 3, we will generally find that you have a 'marked' limitation if you are functioning at a level that is more than one-half but not more than two-thirds of your chronological age when there are no standard scores from standardized tests in your case record." Plaintiff argues that the BDI-II scores are "standard scores from standardized tests," thus rendering this definition of a marked limitation inapplicable.  However, the scores reported by Ms. Vick are the scores that are by their terms "standard scores from standardized tests," although the validity of those normal scores is undermined by the observations recorded in Ms. Vick's report.  Although the ALJ did not explain her reasoning in applying this standard for determining whether marked limitations are indicated, the undersigned finds no error in light of the substantial evidence supporting her determination of less than marked limitations.

expressive language test results and the reports of tantrums in discussing the evidence bearing on the child's ability to interact and relate. (Tr. 20) However, the ALJ also noted that at that 23 month evaluation, the child was able to interact and communicate wants and needs in various ways despite his inability to combine words at that point, and in the months that followed he demonstrated improvement in this domain with speech therapy. Indeed, at 29 months old his speech pathologist noted improvements including spontaneous use of two- to three-word utterances and imitation of novel 2-word utterances. (Tr. 480) As to the evidence of the child's tantrums, this is not well developed in the evidence as an abnormality which would justify a finding of marked limitations in interacting and relating with others, and was dismissed by the ALJ as "somewhat indicative of a two-year old child." (Tr. 20) While plaintiff argues that a hearing test was scheduled at 23 months old due to the child's aggressive and self-injurious behaviors, the note of this hearing screening does not reveal that any such concerns motivated the referral to testing, but merely lists these "behavioral concerns" while identifying the reason for the screening as "[c]oncerns regarding speech and language, reporting that [K.A.W.] tried to say several words, but that he was often difficult to understand" (Tr. 502). The hearing screening was unremarkable. The undersigned finds that substantial evidence supports the ALJ's findings with regard to this domain.

Regarding the domain of caring for yourself, the ALJ found that the child had no limitation. As part of that determination, the ALJ noted that the child had been feeding himself in age-appropriate ways, including eating bite-size pieces of food with a spoon and drinking from an open cup at 23 months old. (Tr. 22) Plaintiff argues that the ALJ failed to consider the child's dysphagia and the associated requirement that his liquids be thickened before they are consumed, diagnosed when he was 21 months old. (Tr. 458-59) Plaintiff

14

contends that "[s]ince K.A.W. is an infant, a caretaker must thicken his liquids, which, effectively, gives K.A.W. 'disordered eating patterns' and renders him unable to feed himself 'age appropriately,'" in contravention of the ALJ's finding that his eating and drinking behaviors are normal. (Docket Entry No. 19 at 15) However, the undersigned finds this argument to be lacking in logic, inasmuch as a child that age would need all food and drink to be prepared by his parent or caregiver for his consumption. Being unable to independently add thickener to the contents of his cup does not render K.A.W.'s drinking patterns disordered. There is no evidence that K.A.W. displayed any deficit regarding age-appropriate drinking behaviors, such that his ability to care for himself was limited. Moreover, despite plaintiff's argument that K.A.W. engages in self-injurious behavior (i.e., "banging his head" and "falling out" (Docket Entry No. 19 at 15)), the undersigned finds that this infantile behavior is not the sort contemplated in the regulations as indicating an inability to care for oneself. The regulation gives examples of such behavior including "e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take your medication[.]" 20 C.F.R. § 416.926a(k)(3)(iv). While plaintiff contends that K.A.W.'s speech therapist testified that such behaviors prevented him from learning (Docket Entry No. 19 at 15-16), the undersigned is unable to locate any such testimony, and in any event, does not see any correlation with the domain of caring for yourself. Substantial evidence supports the ALJ's determination that K.A.W. had no limitation in this domain.

Regarding the domain of health and physical well-being, plaintiff argues that the ALJ gave insufficient consideration to the effects of K.A.W.'s lung and respiratory system problems, his congenital heart defect, and his dysphagia, which she argues cause difficulties addressed by this domain, i.e., "somatic complaints related to the impairment (e.g., recurrent

infections), limitations in physical functioning because of need for frequent treatment or therapy (e.g., nebulizer treatments); periodic exacerbations from impairments that interfere with physical functioning and medical fragility requiring intensive medical care to maintain level of health and physical well-being." (Docket Entry No. 19 at 16)  However, the undersigned finds that the ALJ gave due consideration to all of these impairments and their effects, as follows:

> The medical evidence of record reveals that the claimant was born with congenital heart disease, for which he has been followed by a cardiologist. Treatment records from Midwest Children's Heart Specialists, Midwest Pediatric Cardiology, Vanderbilt University Medical Center and Pediatric Associates of Davidson County revealed that the claimant has been asymptomatic and stable from a cardiovascular standpoint.  There have been no episodes of cyanosis, respiratory distress, diaphoresis, syncope or failure of growth.  No heart surgery has ever been done and is unlikely to be needed because the claimant has done extremely well from a cardiovascular standpoint.  Moreover, the claimant was routinely noted to have normal growth and development.  In addition, the claimant's treatment records pointed out that he does not have any activity restrictions.  With respect to the claimant's asthma, there is evidence of some exacerbations, which have required emergency room treatment [(twice in April 2010, once in September 2010, twice in October 2010 and once in May 2011 and September 2011)]. However, there is no evidence that this occurs on a frequent monthly basis and the claimant has not required any inpatient hospital treatment.  For these reasons, the undersigned has determined that the claimant has less than marked limitations in health and physical well-being.

This determination is well supported by the record as a whole.  While the ALJ did not give express consideration in this domain to the child's dysphagia, it is not argued that this condition requires anything more than the addition of a thickening agent to the liquids that K.A.W. consumes.  There are no ongoing treatment needs as such, and plaintiff does not allege any side effects from the thickener.  Moreover, the fact that the child must be

monitored by a cardiologist and is at an increased future risk of cardiac problems does not alter the analysis of his cardiac health at the time in question, which was stable. It is argued that plaintiff's vigilance in meeting the medical needs of her child and the practical difficulty of doing so was not given adequate consideration as it relates to the child's ability to control his symptoms, since "he is utterly reliant on his mother for treatment" and "[t]herefore, his impairment effectively 'cannot be controlled by treatment or medication' unless his mother is available." (Docket Entry No. 19 at 19) However, again, no child the age of K.A.W. has the ability to manage his own symptoms by treatment or medication. The difficulty of his mother's task as sole caregiver is not lightly regarded, and her dedication to meeting this burden at any cost is laudable. However, the fact remains that K.A.W.'s medical needs were being met during the period under review, and so even considering the child's dependence upon his mother, the record simply does not support a level of physical limitation or "medical fragility" that suggests marked limitations as of the date of the ALJ's decision.

The decision of the ALJ is supported by substantial evidence on the record as a whole, and should therefore be affirmed.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections

filed in which to file any responses to said objections.  Failure to file specific objections

within fourteen (14) days of receipt of this Report and Recommendation can constitute a

waiver of further appeal of this Recommendation.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985);

<u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).


   **ENTERED** this 20th day of November, 2015.


      s/ John S. Bryant
     JOHN S. BRYANT
     UNITED STATES MAGISTRATE JUDGE